[No. 2008.]

CHARLES SMITH *v.* THE STATE.

1. CONSTITUTIONAL LAW — GRAND JURY — CASES APPROVED.— As already announced in Lott's case, 18 Texas Ct. App., 627, and in McNeese's case, *ante*, page 48, a constitutional grand jury in this State is composed of twelve and no other number of men, and an indictment presented by a pretended grand jury composed of any other number is a nullity and incapable of conferring jurisdiction upon any court of this State, and that objection to such an indictment is fundamental and jurisdictional, available at any stage of the proceedings in the lower court, even without exception, and is an error to be revised by this court upon its own motion, if apparent of record.

2. SAME — DISCHARGE OF A GRAND JUROR — CASE STATED.— The record discloses that, on July 3, 1882, in the district court of Webb county, where the indictment was found, twelve persons who had been previously selected as grand jurors appeared in open court and were duly qualified, impaneled and organized as a grand jury for the term, and that one G. was one of the twelve grand jurors thus impaneled. The record recites the following from the minutes of the court, as of date July 10, 1882, on which day the grand jury had been in session at least six days: "And now, on this day, the grand jury, through their foreman, report to the judge presiding that they had excused one of their number (said G.) from further attendance on their meetings at this term of the court. . . . And now on this day came into open court the grand jury, and through their foreman hand to the judge presiding the following bills of indictment" — including the indictment in this case. The objection urged by the defense to the indictment is that it was presented by a grand jury whose organization and autonomy were completely destroyed by its own action in excusing one of its members from further service during the term; or, in effect, that the indictment was presented by a grand jury which, in violation of the Constitution, was composed of eleven jurors, and was therefore incompetent to confer jurisdiction upon the court. *Held*, that the objection as urged to the validity of the indictment cannot prevail, because the authority to permanently excuse from service a single grand juror, after the grand jury is organized and impaneled, is vested neither in the court itself nor in the grand jury, and the action of the grand jury in this case, in excusing the juror G. for the term, was a nullity and absolutely void, and did not operate to discharge him. Moreover, under the law of this State nine members of a grand jury, once legally organized, constitute a quorum "to transact business and present bills," and it appears by the recitals in the record that the juror G. was not attempted to be discharged until after the presentation of this indictment. See the opinion *in extenso* on the question.

3. BILL OF EXCEPTIONS — PRACTICE.— If a party be dissatisfied with any ruling, opinion or action of the court upon the trial, he may except thereto at the time the same is made, and at his request time shall be given him to embody such exception in a written bill. (Rev. Stats., art. 1358.) Refusal by the trial court of a request for such time is, therefore, apparent error. Such errors, however, unless they operate to prejudice some right of the party, will not necessarily require a reversal of the judgment. See this case in illustration.

4. MURDER — IMPLIED MALICE — CHARGE OF THE COURT. — Upon the subject of implied malice, the trial court, in a murder trial, charged the jury as follows: "Malice is implied from the commission of any premeditated, deliberate killing, or where the killing was done suddenly, without any, or without a considerable, provocation." *Held* abstractly incorrect, and material error in this case, in view of the defense of insanity which was supported by evidence tending to establish it. This instruction declares a sudden killing, without provocation, to be *per se* a killing upon implied malice; whereas such a killing could and might be committed by an insane person, in which event it would be excused for the want of that "sound memory and discretion" essential to the crime of murder. See the opinion *in extenso* for a correct definition of implied malice.

5. SAME. — The concluding sentence of another paragraph of the charge instructed the jury as follows: "If, however, you shall have a reasonable doubt of his being guilty of murder in the first degree, you will acquit him of murder in the first degree, and find him guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any number of years not less than five." *Held*, that though the previous context of the paragraph qualifies this sentence by presupposing the jury to have found the fact that murder had been committed, the sentence is objectionable as being calculated to mislead the jury; the same being a separate sentence and detached from the context by a full period.

6. SAME — INSANITY. — It is incumbent upon a defendant who relies upon his plea of insanity to show his insanity clearly, and to that extent that the minds and consciences of the jury can say that, on account of his insanity, he was guiltless of entertaining the criminal intent essential to responsibility for the crime charged. This rule is not infringed by an instruction to the effect that the defense of insanity must be clearly proved, and that the insanity must have existed at the very time of the commission of the offense. See the opinion on the question.

7. SAME. — In failing to submit a direct, positive and affirmative instruction upon insanity as a defense, and in failing to instruct the jury that "no act done in a state of insanity can be punished as an offense," the trial court failed to charge all the law of the present case.

APPEAL from the District Court of Nueces. Tried below before the Hon. J. C. Russell.

The indictment in this case was presented in the district court of Webb county, Texas, on the 10th day of July, 1882. It charged the appellant with the murder of Thomas Riley, in Webb county, Texas, on the 15th day of February, 1882. The venue was changed to Nueces county, Texas, on the motion of the appellant, and his trial, which was concluded on the 27th day of August, 1885, resulted in his conviction of murder in the second degree, his punishment being assessed at a term of ten years in the penitentiary.

John Littell was the first witness for the State. He testified that he knew the defendant and was acquainted with the deceased in his life-time. The deceased was killed in Sim Cooley's gambling house

in Laredo, Texas, on the 15th day of February, 1882. He was shot twice. One ball entered the left eye and passed entirely through the head, and into a wall beyond. Another ball penetrated his shoulder. Witness went to the bar-room in the same building between 9 and 10 o'clock on the morning of the shooting. Going from the bar to the billiard room, the witness passed through the gambling room, and saw the deceased and the defendant playing at faro. As he passed through he heard the deceased say: "I believe we will close." When witness reached the billiard room he heard a shot, and returned to the gaming room just in time to see a Mr. Thompson easing deceased to a lying position on the floor, from the chair in which he was shot. Witness examined the body. Witness found two holes in the wall behind deceased's chair, from one of which he dug out a bullet and a fragment of the deceased's skull, which was imbedded with the bullet. When witness passed through the gambling room and saw the two men playing cards, the deceased was sitting at the table, between the wall and table, and the defendant at the same table, opposite and facing deceased. This was about 10 o'clock in the morning. Witness afterwards saw the defendant in the bar-room, under arrest, and in the custody of Bob Shaw, who presently turned him over to Deputy Sheriff Brune. This was about ten minutes after the shooting. Defendant and deceased were both gamblers. Riley, the deceased, was about thirty years old, and was blind of his left eye. Witness had known him about two years. When the witness went into the gambling room the second time, he saw that the ivory chips which had been used in the game were scattered over the floor. Riley was an employee of the house, and had been on service there for some six months. Witness was not certain, but thought that three shots, in all, were fired. He did not of his own knowledge know who killed the deceased.

Lott Johnson was the next witness for the State. He testified that he was in Laredo on the 15th day of February, 1882, and was about Sim Cooley's premises when Riley was killed on that morning. When the witness first saw the defendant and the deceased on that morning, they were seated at a table in the gambling apartment of Cooley's establishment, playing at a game of faro. Deceased sat at that side of the table next to the wall, and faced defendant, who sat opposite him. They were playing quietly when witness first entered the room, and took his seat at the table. The game proceeded quietly for the first few minutes, nothing being said by either of the parties. Finally defendant staked and lost what "chips" he had, and asked deceased to lend him some more chips.

Deceased refused in a positive manner, saying that the company would not permit him to do so. Defendant insisted that, inasmuch as deceased had indulged him up to that time, he ought to give him one more chance to get even. Witness, seeing that "things were getting a little thick," left the room. When he left the room both defendant and deceased were seated quietly at the table, the defendant having a few chips in his hand. Witness heard the shots after he left the gambling room, and did not see Smith again until late that evening.

Lee Ward was the next witness for the State. He testified that he lived in Laredo, in February, 1882. He formed deceased's acquaintance only a day or two before he was killed. Witness last saw him alive in Sim Cooley's gambling room in Laredo, Texas, between 9 and 10 o'clock on the morning of February 15, 1882. He and the defendant were at that time at a faro gaming table, deceased sitting next to the wall, and defendant standing opposite. They were not playing the game when the witness saw them. The witness judged by their actions that they were talking, but witness could hear nothing they said. Defendant had some faro chips in his hand. Presently the defendant put his right hand to his hip, the chips fell from his hand, the witness started out, and heard a pistol fire. Witness heard but two shots, though possibly three may have been fired. The witness next saw the defendant when, four or five minutes later, he was arrested in the bar-room and his pistol taken from him. Defendant came into the bar-room door, when he was pushed against the counter, arrested and disarmed by Robert Shaw. His pistol was an ordinary sized weapon. Witness then went back into the gambling saloon, and saw Riley not quite dead. Witness saw a wound over the deceased's eye. The ball passed entirely through the head and lodged in the wall, behind the chair in which the deceased was sitting when shot.

On his cross-examination the witness testified that he had known Riley by sight for perhaps a year. He did not know defendant previous to the shooting. He had never before seen the defendant and Riley together. The witness was not positive that the defendant and the deceased were talking when he first saw them, as he could not hear them, but their actions indicated that they were. Witness left the room when defendant dropped the chips he had in his right hand. Witness did not know who fired the first shot. There were several other parties about that and other gaming tables in the room. There were perhaps eight or ten people in the room at the time of the shooting.

Frank Webb testified, for the State, that he was in Laredo on the 15th day of February, 1882. He then knew both the defendant and the deceased. He saw them both twice on the morning of that day in Sim Cooley's gambling room. He first saw them playing cards between 7 and 8 o'clock. He went in through the second door of the billiard room to the gambling room door, and looked in and saw several persons gambling, defendant and Riley among the number. The witness remained at the door long enough to see that he could get no work in there (he was then a boot-black), and left. Between 9 and 10 o'clock witness went back to the gambling saloon. He went in at the east door of the billiard room on the south side of the building, and through that room into the gambling room. Pushing a Mexican aside, witness got up to the table at which defendant and the deceased were playing. He stood on the north side of the table. After a time, defendant played all the chips he had, and asked for more, which were given to him by deceased. After he played and lost all of those he got from Riley, he asked for more. Riley replied to that request: "We have been playing on tick all night, and I cannot let you have any more." Defendant asked: "Won't you let me have one more chance to get even?" Deceased replied: "It is time for the game to close." Defendant again asked for more chips, and Smith replied in a firm, peremptory manner: "No." Defendant then reached across the table, took up a handful of chips, threw them in Riley's face, and, before Riley could make a motion, pulled his revolver and shot Riley — or at least shot at him. Witness saw the flash of the first shot before he could move from the table.

Witness ran out of the room as soon as the first shot was fired. He looked back as he ran, and saw the flash from the second shot. Witness did not look back again, but ran into the billiard room. After the shooting witness went back into the gambling room and saw Riley lying on the floor in a pool of blood, noticing at the same time that his head was bloody. No one was there in the room with Riley. Witness went out at the door on the north side of the building, and saw some one, he did not remember who, with defendant in charge.

Cross-examined, the witness stated that he had never before testified about this case except before the grand jury. Witness was seventeen years old at the time of the shooting, and at the time of this trial was within a few days of his twentieth anniversary. Witness testified now only from memory, as he made no memoranda of the facts. Witness had related his narrative a few times, but he

could not remember to whom, except Mr. Tarver, Mr. Babcock and Mr. Nicholson. He related the facts to them as nearly as he could. Witness could not remember whether he told them that he went out of the gambling room at the north or west door, or simply at a door. He could not remember whether or not he told them that there were other persons in the gambling room at the time of the shooting. He could give no reason why he did not go into details to the gentlemen named as he had on the stand, but, at all events, he thought that the incidents of a homicide would scarcely become effaced from the memory of a witness. As for himself, he rarely, if ever, got into the dark alone that the panorama of this killing did not pass in review before his mind's eye. Witness corrected his former statement by saying that he left the gambling room after the first shot by the west and not the north door. Witness made this mistake through his misunderstanding of the diagram used in evidence, and with respect to which he was testifying.

The witness denied that, before the first shot was fired, he ran out of the gambling room, through the billiard room, and out across the pavement into the main street. Witness did not know one Mr. Phil Heitzen. He did know Mr. Nelson, but did not see Nelson on that morning. Witness returned to the gambling room after the shooting was over, stayed in there but a few moments and left. After the first shot was fired, witness ran to the first door on the west side of the building, looked back, and ran out of the door. Thence witness proceeded a little slower, into the small whisky room, where he slackened his pace. He did not go thence into the street, but back through the billiard room into the gambling room. Witness accomplished these movements within a minute and a half of time. He could not estimate the distance thus covered, but it was not done in remarkably quick time. Nevertheless, witness responded promptly to his anxiety to "get out of there." Having passed through the first door the witness proceeded in an ordinary walk. The witness was greatly excited at the time — frightened somewhat, perhaps,— but was not demoralized. He could not remember whom he saw in the billiard room; in fact, he was too anxious to reach the next room, to take any notice of any one in that room. How it was that witness was enabled to abate his pace, despite his great excitement, is easily explained. His rapid progress was impeded by a crowd as anxious as he to get through the door. That crowd surged through in a compact mass.

The distance between the defendant and the witness when the first shot was fired was, perhaps, a little more or less than three feet.

The defendant and the deceased were about the same distance apart. Witness could not approximately estimate the distance between the deceased and the muzzle of the pistol when the first shot was fired. The weapon may have been held, for aught he knew, within three inches of the deceased's head, or fired from a distance of three feet. Since the killing of Riley, witness had lived in Monterey, Mexico, and Columbus, Texas. He had attended the State normal school since then. Prior to that time he had little or no education, and followed the trade of a boot-black. Witness was not put under bond for his appearance to testify, but was placed on his own recognizance. Witness attended court to testify in this case once in 1882, but not afterwards until at the present term. He was present now in response to the request of Mr. Nicholson, who wrote to him on behalf of the district attorney. He would not have come had he not thought that his traveling expenses both ways would be paid him. Riley did not resent defendant's action in throwing the chips in his face. State closed.

Jesse Bennett was the first witness for the defense. He testified that he lived in the city of San Antonio, Texas. He had known the defendant for seventeen years, during which time he often saw him in San Antonio, and in other towns in Texas. Witness knew the defendant in the years 1877-8-9, and knew his mental condition during those years. Witness was a deputy sheriff of Bexar county, on duty in San Antonio, in December, 1877. The weather was unusually cold during that month. Capt. John Dobbin, who was city marshal of San Antonio in December, 1877, found the defendant running wild on the streets of San Antonio, and brought him to the county court room and turned him over to Deputy Sheriff McCall. Defendant was brought to the county court room as a crazy man. Witness and McCall took him to his mother's house, who with some of his friends agreed to take charge of, watch and control him.

Cross-examined, the witness stated that the tenor of the defendant's talk, while in custody at the court room, was the girl, Rosa Moretta, who he claimed was his girl, and that she had been taken from him. Witness had had but little opportunity to judge of defendant's condition since he removed from San Antonio to Laredo. He had seen him but few times since then, and only when passing through Laredo.

Captain John Dobbin, the next witness for the defense, testified that he had lived in San Antonio since 1847, and had known the defendant since he attained his twelfth or thirteenth year of age.

Witness was city marshal of San Antonio in 1877, and in November of that year took the defendant into custody. The circumstances of that arrest were these: Crossing the square on the day in question, the witness saw the defendant in Sol Deutsch's store, at the front door, which faced the Main Plaza from the west side. He was throwing rolls of carpeting and other goods from the store to the sidewalk. Supposing that he was drunk, witness arrested him. On close examination, however, the witness discovered that he was not drunk, but crazy. Deputy Sheriff McCall ordered witness to take the defendant home, which the witness did. His mother and friends agreed to assume charge and control of him. His talk and laugh were very singular and queer while in witness's custody. He ordered his mother to be quiet and still when she was perfectly silent and quiet. ' He complained that " his girl " had been taken from him. Witness went to his home twice afterwards on the same day to see how he was getting along, and found him resting quietly. Witness saw him before arresting him, on the same day, in Haas & Oppenheimer's store. He ran into that store through one front door and out of another, kicking over a clothing sign, and scattering clothing. His condition then was plainly that of an insane man. Witness could not recall the language he used, but he certainly talked strangely to be a sane man.

The defense next introduced Tom Coleman, who testified that he had known the defendant since 1875. Witness went to San Antonio in 1877. Defendant wrote him two notes or letters, which he sent by his brother, and witness went to see him at his mother's house. He found the defendant at his mother's house, dressed in a long black coat, belted around the waist with a red sash. He told the witness that he was an officer of the army. He had a small cane in his hand which he was using as a sword, temporarily he said, as he would have a fine sword in a few days. The witness was then on his way to Fort Clark, and it was decided that defendant should go with him. Sam Brewer, George Smith, defendant's brother, witness and another man took him to Fort Clark. He behaved very well *en route*, but would frequently talk flightily, at which times witness always thought him crazy. He was in a very bad condition during his stay in Fort Clark. On one occasion a man rode into Fort Clark and tied his horse, with a Winchester rifle attached to the saddle, to a post. Defendant, on discovering the horse, uttered a loud yell, ran to the horse, jumped on him, and rode him full speed to the Las Moras mountain, about four miles distant, firing off the gun indiscriminately all over the country. Some of

the boys followed him and brought him back. On his return he was asked if he saw any deer. He replied that he saw many, but that to escape his fire they all dived into the ground. Defendant remained at Fort Clark some two or three months, and witness, judging from his manner and conduct, thought him crazy. Witness knew defendant's mother and his uncle Ike Brewer. The latter, judging from his conduct and conversation, is not of sound mind.

Cross-examined, the witness testified that he had known the defendant about eight years. Defendant was a sporting man, and ran sporting games for other parties. He was a sporting man prior to 1877, but was not sporting in that year. Witness was a sporting man. Ike Brewer, the uncle of the defendant, was engaged in no business other than walking the street.

Mathias Cranston was the next witness for the defense. He testified that he had known the defendant since 1873. He saw the defendant in Fort Clark in 1877. Inasmuch as witness roomed with the defendant for two months in Fort Clark, in 1877, and saw his almost every action, he felt justified in claiming to know his mental condition at that time. There was no manner of doubt in the witness's mind that the defendant was insane during those two months. Several parties, including witness, Brewer, Bailey and others from San Antonio, kept watch over defendant all the time. This witness described the horse and rifle episode exactly as Tom Coleman did. On another occasion, during witness's custody of defendant, the witness having told him to call on him for money at his pleasure, the defendant came to him and told him that he had made a few purchases at the store in Fort Clark, and wanted money to pay for them. Witness asked what he had bought. He replied that he had bought eight or nine suits of common clothes. Witness advised him to wait until they went to some town where good clothes could be obtained. Defendant consented after a time. He then had a great abundance of good clothes.

Jason Wilson was the next witness for the defense. He testified that he had known the defendant since his early youth. Defendant was in the employ of the witness and Mr. Rodick at the time of the killing of Riley. Witness saw him daily for a month or two prior to the killing of Riley. He saw him on the evening or night before the killing. Sometime before that killing the witness and Rodick, in consultation about their business, discussed the condition of the defendant. Basing their opinions upon his general actions, they reached the conclusion that the defendant was not a rational being. Witness could recall no single act upon which they predicated their

opinion, but they reached the conclusion that he was unsafe and unreliable. Witness very soon afterwards discovered that defendant was mentally incompetent to transact business for him and Rodick. During his service with witness and Rodick, the defendant suddenly, unaccountably and without notice, went to San Antonio. He was exceedingly nervous at that time, and, as he was working for witness and Rodick, they used every effort to induce him to deport himself in a business way. He could not be controlled. He lost heavily gambling on the night before he left for San Antonio. Next morning he was much agitated and excited. He returned from San Antonio in a few days, when witness remarked to Rodick: "Something is the matter with that boy." Rodick spoke of defendant's condition to Lamb and Riley. From his general conduct and actions while in the employ of witness and Rodick, they considered the defendant insane.

Cross-examined, the witness said that, at the time spoken of, he was managing a gambling house for Mr. Rodick, and the defendant was dealing a monte game under witness's supervision. The average custom on defendant's table at night was about $750. Riley was dealing faro at Sim Cooley's gambling house. These were not opposition houses, as Rodick was interested in both. On the night before the killing, the witness removed the money from defendant's table, and locked it up, as he considered him too unreliable to be trusted with it. Witness did not then trust him about anything, but was looking after things himself every day. Defendant was about witness's place until 9 or 10 o'clock on the night before the killing. From there he went to Cooley's gambling house, and entered the game at Riley's table. Witness looked in at Riley's, but did not stay. He understood while there that defendant had lost a considerable amount, and had acted ridiculously. He had been drinking but little. Witness was at the telegraph office when Riley was killed. He afterwards saw the body.

Mrs. Heitzen, the defendant's mother, testified in his behalf that the defendant lived with her in Laredo at the time of the killing of Riley. For three weeks prior to the killing the conduct of the defendant was very peculiar and very wild. He left suddenly for San Antonio, and returned in a few days, his wild condition of mind very much aggravated. It continued to get worse until the 13th of February. On the night of that day he woke up suddenly, weeping violently, wringing his hands and saying that he had just received a letter from his brother George at San Antonio, and demanding that his clothes be packed for a trip to San Antonio. His

brother George had then been dead a little over three years. When he came home on the 14th day of February, the day before the homicide, he appeared very much troubled, and said that he wanted no dinner. After a late dinner, he left the house and witness saw no more of him until after Riley's death. Two uncles of the witness, on her father's side, and one of witness's brothers, Nathaniel Brewer, died insane, and witness's only living brother, while not insane, is idiotic. Witness's knowledge of the circumstances surrounding defendant enabled her to declare that he was not a responsible being on the 15th day of February, 1882. Defendant was flighty-minded from his infancy, and eight years prior to this trial was generally pronounced insane, and was insane and entirely destitute of reason. He was then kept locked in a room for three weeks, and then was sent to Fort Clark.

Miss Jennie Miller was the next witness for the defense. She testified that she had known the defendant about five years. Witness lived with defendant's mother in Laredo, when Riley was killed. Defendant came home late on the night of February 13th, very much troubled and distressed, and in that condition went to bed. Suddenly he woke up weeping and screaming. His mother asked him what was the matter, and he replied that he had just received a letter from his brother George. His brother George had been dead three years. Chloroform was administered and he grew quiet. His actions next morning were strange and wild. He said that he was going down to Jack Harris's to see his brother George. "Jack Harris's" was a saloon in San Antonio. He went from home to town on the morning of the 14th, and came back to dinner late. He went back to town, after refusing to eat, and witness saw no more of him. Witness thought from his acts that he was crazy.

W. H. Nelson was the next witness for the defense. He testified that, at the time of the killing of Riley, he was running a house of his own opposite Cooley's establishment in Laredo. Witness went to Cooley's saloon on the morning of the killing to get a drink. From the saloon he went into the billiard room, which led into the gambling room. Witness was going in at the billiard room door fronting the street when the first shot was fired. From that door, witness saw parties running from the gambling into the billiard room. This was just before the first shot was fired. Several persons besides the boy Frank Webb ran out. Witness heard two shots, and he saw the boy Frank Webb, whom he knew well, in the billiard room long before the first shot was fired. Webb came out with others who fled from the gambling room.

Cross-examined, witness said that he saw Lott Johnson, Lee Ward, Lewis, Frank Webb and others come out of the gambling. room before the first shot was fired. They came out together. The witness denied that, on the night previous to this trial, when standing on the gallery of the St. James, he told the district attorney and Mr. Pierce that he did not see Frank Webb until after the first shot was fired. The defense closed.

Frank Wallace testified, for the State, in rebuttal, that he was in Cooley's saloon on the day of the killing. He saw the defendant in the gambling room playing against Riley's bank, but did not know his mental condition. He might or might not have been excited — the witness did not know; nor did he know whether he was sane or insane. The witness did not think an insane man could protect himself. Witness saw defendant when he came out of the gambling room after the shooting, and when he was arrested. He looked perfectly calm as he came out of the gambling room. Witness did not see Mr. Nelson about Cooley's on that morning.

The motion for new trial presented the questions discussed in the opinion.

*Welch & Givens* and *E. J. Hamner*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appellant was indicted in Webb county for the murder of one Thomas Riley. On his application the venue was changed to Nueces county, where upon trial of the case he was convicted of murder of the second degree, his punishment being assessed at ten years' imprisonment in the penitentiary.

The first error complained of is that the court was without jurisdiction to try the case, because the record shows that the indictment was found and presented by an illegal grand jury, the same being composed of but eleven men.

In Lott's case this court held that a grand jury in this State, as constituted by section 13 of article V of the Constitution, is composed of twelve men, and no other number greater or less. Such a grand jury alone can present a valid indictment under our Bill of Rights (Const., art. I, sec. 10), and an indictment presented by a purported grand jury composed of any other number of men is an absolute nullity, and incapable of conferring jurisdiction upon any court of this State. Such error goes to the foundation of the suit, and can be availed of in any manner and at any stage of the proceed-

ings, even without exception below, and on appeal will be revised by this court if apparent of record. (18 Texas Ct. App., 627.) This doctrine has been reaffirmed at the present term in the case of *Mc-Neese* v. *The State.* (*Ante*, p. 48.)

Now let us see how the matter is made to appear in the record before us. In the district court of Webb county, where the indictment was found, it is shown that on July 3, 1882, *twelve* grand jurors who had been previously selected and summoned, and whose names are set out, appeared in court, were duly qualified, organized and ·impaneled as a grand jury for the term. One Cayetano De La Garza was one of the twelve grand jurors thus impaneled.

On Monday, the 10th day of July, 1882, and after the jury had been in session six days at least, the record contains this recital, viz.: " Monday, July 10th, 1882, and now on this day the grand jury through their foreman, S. T. Foster, Esq., report to the judge presiding that they had excused Cayetano De La Garza, one of their number, from further attendance on their meetings at this term of the court. . . . And now on this day came into open court the grand jury, and through their foreman hand to the judge presiding the following bills of indictment;" and amongst them was the indictment in this case.

It is contended that when one of their number was excused for *the term*, that broke up and disorganized the entire body, and completely destroyed its autonomy. The proposition insisted upon is that " there was and is no authority in the trial court or in its adjunct, the grand jury, to excuse for the term one of twelve members of a grand jury, and thus leave it, in violation of the Constitution, *composed of eleven men.*"

It is declared by the Constitution that " grand and petit juries shall be composed of twelve men; but nine members of a grand jury shall be a quorum to transact business and present bills." (Const., art. V, sec. 13.) Under provisions of the law sixteen men are selected and summoned (Code Crim. Proc., art. 357), out of whom twelve are to be selected and organized. When less than twelve of those summoned attend, the court shall order the sheriff to summon such additional number of persons as may be deemed necessary to constitute a grand jury of twelve men. (Code Crim. Proc., art. 368.) " Nine members shall be a quorum for the purpose of discharging any duty or exercising any right properly belonging to the grand jury." (Code Crim. Proc., art. 390.) We know of no authority of law which gives to a grand jury, once organized, the power to excuse one of its members for the term. Such practice is, to say the least of it, irregular. We think that the law contemplates that

there must, until they are discharged by the court for the term, be always subject for duty, if necessary, twelve men. They are not all required, however, to be present and acting when a bill is found, because nine are declared a quorum, and nine can "transact business and present bills." Such being the case, we think the jury might very properly, when necessary, excuse one or more of its members temporarily, so as the body be not reduced below a quorum of nine men at any one time.

But did the unauthorized act of the grand jury discharge the juror? We think not. The court alone could discharge the duly, organized grand jury as a body for the term. It has no authority to discharge a single juror after being impaneled, for the term, any more than the grand jury has. It follows, then, that the authority to discharge was wholly wanting, and the pretended discharge was therefore an absolute nullity, and the juror was still as much liable to be required to do duty as any of those remaining. The action was not only irregular but was absolutely void, and, being void, it could not and did not affect the legal constitution of the grand jury as originally organized by the court. That organization still remained, and if nine of that organization were present and transacted any business that the whole body could transact, even to the finding and presenting of bills, that was sufficient under the Constitution and laws. (*State* v. *Miller*, 3 Ala., 343.)

Moreover in this case, for aught that appears, the supposed discharged juror was not discharged or attempted to be discharged until after he had acted with his fellows, the other eleven, in finding the bill in this case. The recitals we have copied would indicate that he was. We find no error in the mode and manner of the presentment of the indictment.

Defendant made a first application for continuance, and the district attorney filed a denial of the same, under oath, as to diligence, as is allowed to be done by article 564, Code Criminal Procedure. This denial was presented to the judge with the application, and the court overruled the application, for want of diligence. Defendant's counsel then requested permission to file counter-affidavits and to join issue upon the denial, which the court refused because the application had already been acted upon and overruled. Counsel then saved an exception to this ruling and asked time of the court within which to prepare and present his bill of exceptions, which the court would not allow, but informed counsel that the same could be prepared and presented at some future time; and a bill of exceptions was reserved to this action of the court.

Where a "party is dissatisfied with any ruling, opinion or action

of the court, he may except thereto at the time the same is made, and at his request time shall be given to embody such exception in a written bill." (Rev. Stats., art. 1358; Code Crim. Proc., art. 686; *Sager* v. *The State*, 11 Texas Ct. App., 110; *Knox* v. *The State*, 11 Texas Ct. App., 148.) It was unquestionably erroneous for the court to refuse to allow time to prepare the bill of exceptions then, because defendant had a legal right to have it prepared at that time. But it is not every error which will require a reversal of the judgment, and errors without prejudice are of this character. It is not shown that defendant has been prejudiced, and that the bill subsequently prepared and granted does not present as fully all the matters pertaining to the ruling as they could or would have been presented, if the bill had been prepared and granted at the time of the ruling. The exception made was to the refusal of the court to permit defendant, after the application for continuance was overruled, to file counter-affidavits and join issue in the contest or denial of the district attorney as to the diligence shown by the application. The bill of exceptions is itself defective, in that it fails wholly to set out said counter-affidavits. Unless the affidavits are set out, we cannot tell how far, or whether, indeed, defendant has been injured or prejudiced. It is true that the statute provides that when the statements with regard to diligence are denied under oath, "the issue shall be tried by the judge, and he shall hear testimony by affidavits and grant or refuse the continuance, according to the law and the facts of the case." (Code Crim. Proc., art. 565.) But in this case it appears that defendant did not ask or request permission to file his testimony by affidavits until after the court had determined the issue made by the affidavit of the district attorney, and had overruled the application; nor is it stated or otherwise made to appear that he did not have notice of the filing of the denial and affidavits of the district attorney before the same were submitted to and passed upon by the judge. If he knew of such denial and the filing thereof, and failed to file his counter-affidavits in proper time, and before action by the court, he has no one to blame but himself. But again, the record discloses that on defendant's motion for new trial, when his application for continuance was a second time entitled to be considered by the court, the district attorney again filed his affidavit contesting the diligence disclosed in substantially the same terms and for the same reasons as stated in his denial when the application was presented to the court in the first instance, and we fail to find any counter-affidavits made by and in behalf of defendant even at that time. We do not think the bill of exceptions sufficient either

in the matter as stated or in the prejudice shown to defendant's rights.

Quite a number of objections are urged to the charge of the court. The defense relied upon was insanity, and there was testimony tending to support this defense. The testimony tended to show the hereditary taint of insanity in defendant's family, and the fact that he himself had been deranged more than once prior to the homicide, and there was some testimony as to his condition just previous to the homicide, giving color to the defense. At all events, the evidence was of a character to require of the court a charge upon this defense.

Let us see how the charge is made to apply to this defense.    1. In its fifth paragraph the jury were instructed as follows: "Malice is implied from the commission of any premeditated, deliberate killing, or where the killing was done suddenly, without any, or without a considerable, provocation." This is not a correct rule or definition of implied malice, and especially when applied to the defense set up in this case. A correct rule of implied malice is that "where it is shown that a homicide was intentionally committed, and the facts show that it was done neither with express malice nor under circumstances excusing, justifying or mitigating the act, the law in that event implies malice and the offense is murder in the second degree." (*Douglass* v. *The State*, 8 Texas Ct. App., 520; *Harris* v. *The State*, id., 90; *Hubby* v. *The State*, id., 598; *Ellison* v. *The State*, 12 Texas Ct. App., 558; *Neyland* v. *The State*, 13 Texas Ct. App., 536; *Turner* v. *The State*, 16 Texas Ct. App., 379.)

The vice in the court's definition is apparent when considered with reference to the defense of insanity. It makes a sudden killing which is without provocation *per se* a killing upon implied malice, and murder of the second degree. And yet such a killing could and might be committed by an insane man. If by an insane party, under the circumstances mentioned, the law would *excuse it* for want of that "sound memory and discretion" essential to the crime of murder (Penal Code, art. 607), and moreover because the law itself expressly declares that "no act done in a state of insanity can be punished as an offense." (Penal Code, art. 39; *Webb* v. *The State*, 9 Texas Ct. App., 490; *Erwin* v. *The State*, 10 Texas Ct. App., 700.)

2. The closing sentence of the sixth paragraph of the charge is in these words: "If, however, you shall have a reasonable doubt of his being guilty of murder in the first degree, you will *acquit him of murder in the first degree, and find him guilty of murder in*

*the second degree*, and assess his punishment at confinement in the penitentiary for any number of years not less than five." It is true that the previous context of the paragraph qualifies this sentence, in that it presupposes the jury to have found, and is predicated upon the fact, that murder had been committed. Still the sentence, being a separate one, detached by a full period from the context, is objectionable at least as being calculated, if indeed it did not tend strongly, to mislead the jury.

3. In the seventh paragraph the jury were instructed that the defense of insanity must be *clearly* proved, and that the insanity must have existed at the very commission of the offense. Upon comparison we find this paragraph to be a literal copy of an instruction approved by this court in *Clark* v. *The State*, 8 Texas Ct. App., 350. It is strenuously insisted that the charge is wrong and in conflict with the rule announced in *Jones* v. *The State*, 13 Texas Ct. App., 1, which is, that such substantive defenses as insanity must be established by defendant by a *preponderance* of evidence. We are unable to see any serious, appreciable conflict in the charge and this latter rule. The whole subject is discussed in *Webb* v. *The State*, 9 Texas Ct. App., 490, and *King* v. *The State*, 9 Texas Ct. App., 515, and the rule declared was that the defendant "should show his insanity clearly, and to that extent that the minds and consciences of the jury can say that on account of his insanity he was guiltless of entertaining the criminal intent essential to responsibility for the crime charged." And the same doctrine is reaffirmed in *Johnson* v. *The State*, 10 Texas Ct. App., 571. All that is required is that the evidence should be sufficiently clear to satisfy the minds and consciences of the jury that insanity is proven, and Jones's case simply declares that a preponderance of the evidence may be sufficient for that purpose. The objection is not well taken.

4. Nowhere in the entire charge is there a direct, positive and affirmative instruction upon insanity as a defense, and nowhere were the jury told substantially even what is most emphatically declared by statute to be the law, to wit, that "No act done in a state of insanity can be punished as an offense." (Penal Code, art. 39.) Defendant was entitled to such an instruction.

For errors pointed out in the charge of the court to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered October 24, 1885.]